# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BONNIE WILLIAMS MOORE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:15-cv-00683-MHH** |
| | } | |
| **COMPUTER SCIENCES** | } | |
| **CORPORATIONS,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Bonnie Williams Moore is a former employee of defendant Computer Sciences Corporation. Ms. Moore alleges that CSC discriminated against her on the basis of her race, age, and disability. Based on that alleged discrimination, Ms. Moore asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981; the Age Discrimination in Employment Act, 29 U.S.C. § 623 *et seq.*; the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; and the Rehabilitation Act, 29 U.S.C. § 791. Ms. Moore also asserts a claim under the Family and Medical Leave Act, 29 U.S.C. § 2615, on grounds that CSC allegedly interfered with her ability to take medical leave. (Doc. 1). Pursuant to Federal Rule of Civil Procedure 56, CSC has filed a motion for summary judgment. (Doc. 18). For the reasons set forth below, the Court grants

CSC's motion with respect to Ms. Moore's Title VII, Section 1981, and ADEA claims. The Court also grants summary judgment with respect to Ms. Moore's Rehabilitation Act claim. The Court denies summary judgment on Ms. Moore's ADA claims and on her FMLA interference claim.

## I.  SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party. *See White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). Accordingly, the Court presents the facts in this opinion in the light most favorable to Ms. Moore. *See White*, 789 F.3d at 1191; *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("[W]hen conflicts arise between the

facts evidenced by the parties, [courts] must credit the nonmoving party's version."). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II. RELEVANT FACTS

Ms. Moore is an African-American female. She was born in 1957. (Doc. 24, ¶ 3–5; Doc. 19-1, p. 9). Ms. Moore worked for CSC for nearly 15 years, from 1999 until March 28, 2014.[1] (Doc. 19-1, p. 21; Doc. 24-6, ¶ 24). Ms. Moore began her career with CSC as an account professional in the company's billing and collections division. (Doc. 24-6, ¶ 6; Doc. 20, ¶¶ 3–4). In 2007, CSC promoted Ms. Moore to the position of senior billing accountant/AR lead. (Doc. 19-1, p. 25; Doc. 19-5, p. 32). Ms. Moore held the position of senior billing lead until her employment with CSC ended in March of 2014. (Doc. 24-6, ¶ 6).

In 2004, while working full-time for CSC, Ms. Moore obtained a bachelor's degree in business administration. (Doc. 19-1, p. 23). The following year, she earned a master's degree in business administration. (Doc. 19-1, p. 23). Ms. Moore also obtained certifications in contract management and contract acquisitions, and she took college courses in contracts administration as recently as 2012. (*See* Doc. 19-1, pp. 24–25, 42). In her annual reviews, CSC recognized

---

[1] Ms. Moore worked for Nichols Research Corporation for approximately nine years and became an employee of CSC when CSC acquired Nichols Research Corporation in 1999. (Doc. 24-6, ¶ 24; Doc. 19-2, pp. 4–5; Doc. 21-1, pp. 1–2).

Ms. Moore's ability to continue her education while maintaining a full workload at CSC. (Doc. 19-5, pp. 24, 30; Doc. 24-9, pp. 21, 37).

From 2007 until 2012, Ms. Moore reported to James Romine. Mr. Romine was responsible for completing Ms. Moore's performance appraisals at the end of each fiscal year. (*See* Doc. 24-9, pp. 2, 13, 17, 22, 27; Doc. 19-5, p. 51).[2] For fiscal years 2007 through 2012, Mr. Romine rated Ms. Moore as meeting, exceeding, or far exceeding expectations. (Doc. 24-9, pp. 6, 15, 20, 25; Doc. 19-5, p.51). In fiscal year 2013, Amanda Martin became Ms. Moore's supervisor, and she completed Ms. Moore's 2013 performance appraisal. (Doc. 19-1, pp. 108-109; Doc. 24-9, p. 32). Ms. Martin also rated Ms. Moore's performance as meeting or exceeding expectations. (Doc. 24-9, pp. 32-37).

Ms. Moore's performance evaluations for fiscal years 2007 through 2013 contain almost entirely positive comments. There are two exceptions. Mr. Romine noted in his 2012 assessment: "[a] single area of improvement would be to become more assertive in her role as Lead not only with billers assigned under her but to the entire Huntsville staff." (Doc. 24-9, p. 31). Ms. Martin noted in her 2013 appraisal that "[o]ne single area of improvement is that when issues arise,

---

[2] Ms. Moore's evidentiary submission filed in response to CSC's motion for summary judgment does not contain Ms. Moore's performance review for fiscal year 2009. The 2009 review was produced by CSC as part of its evidentiary submission in support of summary judgment. For this reason, the record citations for the performance reviews are not sequential. Document 24-9 contains reviews for 2007, 2008, 2010, 2011, 2012 and 2013. Document 19-5 contains the 2009 review.

[Ms. Moore] and the biller come see management together." (Doc. 24-9, p. 36).

The evaluations otherwise contain glowing reviews. Here are a few examples:

2007: "She is seen as a team player and is very cooperative. Bonnie's natural demeanor allows her to easily gain the trust and support of her peers . . . . She does not become defensive or irritated when challenged." (Doc. 24-9, pp. 7–8).

2008: "As a Lead, the quality and quantity of work Bonnie produces is consistently among the best and is always within acceptable ranges of accuracy and timeliness." (Doc. 24-9, p. 16).

2009: "Bonnie continues to be a strong Lead not only to her staff, but to the Huntsville billing department as a whole. She consistently demonstrates an understanding nature and excellent training skills both wrapped around the desire for her team to get things done right the first time, but to understand what they are doing and not just going through a motion." (Doc. 19-5, p. 55).

2010: "During the past year Bonnie continued to demonstrate exceptional scheduling and time management abilities. . . . As always, her understanding nature and excellent training skills are to be recognized and commended. Bonnie is by far my #1 Lead in Huntsville." (Doc. 24-9, p. 21).

2011: "FY11 for Bonnie was somewhat full of medical challenges; however, through it all, she continued to demonstrate 'strong lead' abilities for the entire Huntsville Billing department. . . . Bonnie continues to be the 'Mainstay' of the Huntsville Billing Department and is by far my #1 Lead." (Doc. 24-9, p. 26).

2012: "Bonnie is by far the #1 Lead in the Huntsville Billing Office. . . . If CSC had more employees as conscience [sic] of their work, relationships with peers, and that truly exemplified our code of ethics and conduct as does Bonnie, we would be a force to contend with on every front." (Doc. 24-9, p. 31).

2013: "Bonnie continues to be the #1 Billing Lead in the Huntsville Billing Office." (Doc. 24-9, p. 36). "Bonnie continues to give 125%

daily to the Huntsville Billing office.  She often goes over and beyond expectations."  (Doc. 24-9, p. 37).

Ms. Moore's 2013 appraisal, which Ms. Moore reviewed on May 14, 2013, contains a prescient request from Ms. Moore's mentor, Mr. Romine:  "FY2014 is setting up to be a challenging year for NPS Defense Billing so I ask your continued support in helping Huntsville maintain our high quality standards."  (Doc. 24-9, p. 32).

Fiscal year 2014 was a challenging year indeed for both Mr. Romine and Ms. Moore.  The record does not disclose who completed Ms. Moore's performance evaluation in 2014.  The performance appraisal identifies James Romine as the appraiser, but Mr. Romine did not acknowledge or approve the fiscal year 2014 evaluation.  (Doc. 24-2, p. 2).  In the approvals and acknowledgments section of the form, Abbi Malone, identified as the "NLA," noted that the review was approved and returned.  (Doc. 24-2, p. 2).  The space where Mr. Romine would approve the form states only "Administratively Closed: 30 Jun 2014."  (Doc. 24-2, p. 3).

In contrast to earlier performance reviews, Ms. Moore's fiscal year 2014 review states that Ms. Moore met or only partially met expectations.  (Doc. 24-2, pp. 5–6).  Of the eleven total performance factors identified on the form, Ms. Moore received seven ratings of partially met expectations and four ratings of met

expectations. (Doc. 24-2, pp. 5–6). The comments section of the 2014 appraisal states:

> Bonnie is dedicated to meeting the expectations and requirements of internal and external customers and has the technical knowledge and skills to do the job at a high level of accomplishment but is often viewed by her colleagues as too narrow. She tends to depend upon technical and functional knowledge and skills at the expense of personal, interpersonal and managerial skills. Bonnie does; [sic] however, pursue everything with energy, drive, and a need to finish, seldom giving up before finishing, especially in the face of resistance or setbacks. Too often; [sic] however, this trait, when coupled with invoice submission limits tends to confuse people who observe her across different settings and is misinterpreted as to what she deems most important. Bonnie has a tendency to appear overly wise or close to perfect, as someone who can't, doesn't make, or [who is] unable to acknowledge personal mistakes which leads to being viewed by colleagues as stubborn and not willing to negotiate or compromise. At times, she displays frustration when advice is rejected and an undesirable relationship with less data-based people. As a Lead, Bonnie doesn't pick up on social clues that others would recognize often displaying a sense of tenseness causing less than desirable interactions. Bonnie has a good understanding of CSC's CLEAR values with a deep understanding of who our clients are; she uses facts to support straight talk; embraces a profound sense of comment [sic] to our clients and colleagues, although often times being misinterpreted; she looks for ways to continuously improve our processes; and confronts obstacles and strives to overcome them.

(Doc. 24-2, pp. 5–6).

Ms. Moore contends that she did not see the fiscal year 2014 performance appraisal because CSC laid her off on March 28, 2014 before the end of the fiscal year. (Doc. 24-6, ¶ 11). The record indicates that Ms. Moore typically received and reviewed her annual appraisals in late April or May of the calendar year in

which CSC completed the appraisal. (*See* Doc. 19-5, p. 31; Doc. 19-5, p. 52; Doc. 24-9, p. 14; Doc. 24-9, p. 18; Doc. 24-9, p. 28; Doc. 24-9, p. 32).

Ms. Moore received strong annual evaluations in many years in which CSC was trimming its workforce. CSC also reduced the size of its workforce in 2014, the year in which Ms. Moore received her only mediocre annual review. Beginning in fiscal year 2009 and continuing in 2012, 2013 and 2014, CSC implemented budget cuts in all divisions of finance which resulted in reductions in force in CSC's Cash Operations division. (Doc. 21-1, ¶ 3). Kathryn Vadenoff, the Director of Cash Operations for the North American Public Sector, was responsible for deciding which positions to eliminate. (Doc. 21-1, ¶¶ 3, 4; Doc. 21-2, p. 2). CSC's Human Resources Management Policy 213 "Reduction in Force" governed the annual RIFs. That policy provides in relevant part:

> 1.1. When a reduction in the workforce is necessary due to business reasons (including the discontinuance of a business unit or function within a unit), selection of individuals affected shall be based on a combination of factors, including but not limited to CSC's business needs, as well as employee knowledge, skills and ability, reliability, performance and conduct.
>
> ***
>
> 4.1 **Selection for a Reduction in Force** – As outlined in Section 1.1 above, selection for a reduction in force due to business reasons is based upon a combination of factors. However, when two people, in CSC's judgment, possess equal knowledge, skills and ability, reliability, and substantially similar conduct and performance records, the person with the

least length of service shall be selected first for involuntary termination.

(Doc. 21-1, p. 7).

Ms. Vadenoff testified that in preparation for fiscal year 2015 budget cuts, she determined that Organization 114: Defense (Org 114) "had management and lead resources that could be absorbed by a single supervisor, rather than a supervisor and a manager, and by the remaining leads." (Doc. 21-1, ¶ 9). Ms. Vadenoff selected Ms. Moore and Mr. Romine for layoff. Ms. Vadenoff stated that she selected Ms. Moore for layoff "because she was the only lead in the organization to be rated Partially Meets Expectations in the upcoming FY 2014 performance appraisals (the others were rated 'Meets Expectations' or higher)." (Doc. 21-1, ¶ 10). The record does not support this assertion: in her FY 2014 performance evaluation, Dawn Bates, one of the lead billers who CSC retained, received "partially meets expectations" ratings in two categories. (*See* Doc. 24-4, pp. 4–5).

Ms. Vadenoff states that she also considered the interpersonal conflict noted in Ms. Moore's 2014 performance appraisal, as well as her own observation and judgment that Ms. Moore "would be the least receptive to the added workload and least effective in the essential team environment of the down-sized group." (Doc. 21-1, ¶ 10). Ms. Vadenoff testified:

Q: Did you find that Ms. Moore was lacking in employee rapport?

A: Yes.

Q: How did you find that out?

A: Complaints from staff.

Q: Can you just give me some of the complaints?

A: Billers not wanting to work with her; billers having conflicting information; billers calling for confirmation of, well why am I being told this [by Ms. Moore] when this is the way the we've been doing it, I don't understand why my invoices were rejected. She was increasingly difficult to work with . . . .

(Doc. 21-2, p. 4).

Ms. Vadenoff's stated concerns about Ms. Moore's ability to adapt to the added workload and to work well with others in her department do not take into account a host of comments in Ms. Moore's annual reviews, including comments in Ms. Moore's FY 2012 and FY 2013 reviews, about her conscientious approach to her relationship with her peers and her ability to manage heavy workloads. Ms. Vadenoff also did not account for the fact that Ms. Moore attended school while she worked full-time, an effort that enabled Ms. Moore to obtain an advance degree. Ms. Vadenoff testified that she did not take into account Ms. Moore's education level or seniority because the RIF policy did not require it. (Doc. 21-1, ¶ 4). Ms Vadenoff explained:

CSC's Human Resources Management Policy 213 'Reduction in Force' . . . provides that selection for RIF should be based on a combination of factors including CSC's business needs and the employees' knowledge, skills and abilities, reliability, performance and conduct. If in CSC's judgment two employees are equally knowledgeable, reliable, skilled and able, and have substantially similar records of conduct and performance, then the employee with the least length of service is selected. Otherwise, length of service is not a factor for consideration. Educational attainment, as opposed to work-related knowledge, skills and abilities, is also not a factor for consideration.

(Doc. 21-1, ¶ 4).

Viewed in the light most favorable to Ms. Moore, CSC's RIF policy did not preclude Ms. Vadenoff from considering Ms. Moore's education. First, the policy lists specific factors that the decision-maker should take into account, but the policy states that the decision-maker should consider a "combination of factors" that include but are not limited to the specific factors. (Doc. 21-1, p. 7). Second, the policy calls for consideration of "employee knowledge," but does not limit that to knowledge acquired on the job. (Doc. 21-1, p. 7). All of Ms. Moore's annual appraisals, even her FY 2014 appraisal, indicate that Ms. Moore was knowledgeable about her job. Moreover, at the time of the 2014 RIF, Ms. Moore had a master's degree. (Doc. 19-1, p. 23). As of her fiscal year 2013 review, Ms. Bates, another billing lead whom CSC retained in 2014, was pursuing a bachelor's degree. (Doc. 24-10, p. 11). CSC's job description for the position of lead biller requires a "Bachelor's degree or equivalent combination of education and

experience" and states that a "Bachelor's degree in business administration, accounting, finance, or related field [is] preferred." (Doc. 24-8, pp. 3–4).

As previously mentioned, during fiscal year 2014 and within Org 114, Ms. Vadenoff also selected Jim Romine for layoff. He was the manager whose position was merged into a supervisor position. (Doc. 21-1, ¶ 9). Mr. Romine is Caucasian and over the age of forty. (Doc. 21-1, ¶ 9; Doc. 19-1, pp. 50–51). Outside of Org 114, Ms. Vadenoff eliminated four other positions across two organizations.[3] (Doc. 21-1, ¶ 9).

Ms. Moore was diagnosed with cancer twice during her employment with CSC, first in 2010 and again in 2013. (Doc. 24-6, ¶ 5, 7). When she was diagnosed with breast cancer in March 2010, she needed surgery and a period of time for recovery, so she requested FMLA leave. (Doc. 19-1, pp. 35– 37). CSC allowed Ms. Moore to extend her leave beyond twelve weeks; Ms. Moore ultimately was on leave for six months. (Doc. 19-1, p. 36). Ms. Moore returned to work in November 2010 with no restrictions. (Doc. 19-1, pp. 36–37, 39).

In 2013, Ms. Moore's cancer returned. (Doc. 19-1, pp. 19, 46). Ms. Moore testified that her doctor recommended chemotherapy. (Doc. 19-1, p. 46). On October 30, 2013, Ms. Moore met with Cathy Kirby, the CSC leave coordinator,

---

[3] Lead billers in Org 114 who CSC retained in the 2014 RIF include: S. Martin (b. 1960, Caucasian); N. Amoh (b. 1976, African America); A. Achiarya (b. 1981, Asian); L. St. Thomas (b. 1982, Caucasian); D. Bates (b. 1981, Caucasian); and D. Tyagi-Mathur (b. 1987, Asian). (Doc. 24-5, p.2; Vadenoff Dec. ¶ 11).

to request a medical leave of absence. (Doc. 19-1, pp. 19, 35, 46–48; Doc. 24-6, ¶ 7). According to Ms. Moore, Ms. Kirby notified her that she had 480 medical leave hours available. (Doc. 24-6, ¶ 8). CSC maintains that Ms. Moore only stated that she might need a medical leave of absence and that she never made an official leave request. (Doc. 21, ¶¶ 3–4). Ms. Moore admits that she did not complete the FMLA paperwork, (Doc. 19-1, pp. 47, 50), and that she withdrew her request for leave in November 2013. (Doc. 19-1, p. 49).

Ms. Moore testified that she delayed her cancer treatment because Ms. Vadenoff told employees that they could not be sick during the last several months of each fiscal year (January until March)—a time period that CSC employees referred to as "the push." (Doc. 19-1, pp. 33, 48–49). Ms. Moore testified that during the push, CSC employees "were forbidden to take leave." (Doc. 19-1, p. 31). This time frame was called "the push" because "in every fiscal year there was a push to get the bills out." (Doc. 19-1, p. 31). Ms. Moore reports that she delayed her request for leave in 2013 because she was not emotionally ready to begin treatment, and she wanted to wait until the push was over. (Doc. 19-1, pp. 48–49).

Ms. Vadenoff explained that she was not aware that Ms. Moore's cancer returned in 2013 or that Ms. Moore had requested medical leave. (Doc. 21-1, ¶ 6; Doc. 21-2, p. 7). Ms. Vadenoff testified: "I believe once you have cancer, you're

always known to have cancer. So I knew [Ms. Moore] had cancer in 2010, then in 2014 I still knew she had cancer in 2010." (Doc. 21-2, p. 7). Ms. Vadenoff denies making statements that employees could not get sick or take leave. (Doc. 21-2, pp. 7–10).

## III.  ANALYSIS

### A. *Ms. Moore's ADA and Rehabilitation Act Claims*

Ms. Moore contends that CSC violated her rights under the ADA and Rehabilitation Act by discharging her and denying her a reasonable accommodation for her disability. The Rehabilitation Act forbids recipients of federal funds from discriminating against an "otherwise qualified individual with a disability . . . solely by reason of her or his disability." 29 U.S.C. § 794(a). Ms. Moore's complaint asserts that "Defendant company is an employer that receives federal funds" and that "[plaintiff's department] received federal funds." (Doc. 1, p. 2). However, the Court finds no evidence in the record to substantiate this claim. Ms. Moore has not produced evidence that CSC is a federal agency or that it received federal funds. Because the record fails to demonstrate that CSC is a covered employer under 29 U.S.C. § 794(a), Ms. Moore's Rehabilitation Act claim fails as a matter of law.

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or

discharge of employees [or] other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). One way an employer discriminates under the ADA is by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). "An accommodation can qualify as reasonable, and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job." *Lucas v. W.W. Grainger*, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001) (internal quotation marks omitted). The Court first considers Ms. Moore's ADA failure to accommodate claim and then addresses Ms. Moore's ADA termination claim.

1. Ms. Moore's ADA Failure to Accommodate Claim

    *a. Analytical Framework*

As an initial matter, the Court must determine the appropriate framework for analysis of Ms. Moore's failure to accommodate claim. Generally speaking, the burden shifting framework under *McDonnell Douglas* applies to ADA intentional discrimination cases. *See, e.g., Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000); *Bennett v. Dominguez*, 196 Fed. Appx. 785, 791 (11th Cir. 2006). ADA failure to accommodate cases are an exception to this general rule. *See Holly v. Clairson*, L.L.C., 492 F.3d 1247 (11th Cir. 2007). In *Holly*, the Court initially

recognized that the burden shifting analysis of Title VII employment discrimination claims applies to ADA claims. 492 F.3d at 1255. But the Court also found that the *McDonnell Douglas* framework is not well-suited to the analysis of reasonable accommodation claims under the ADA. The Court noted:

> [A]n employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is "otherwise qualified," and unless the employer can show undue hardship. There is no additional burden on Holly to show that Clairson enforced its punctuality policy in a discriminatory manner . . . , nor any subsequent burdens on Clairson to show that it had any legitimate nondiscriminatory reasons for terminating Holly or on Holly to establish that these reasons were pretextual.

492 F.3d at 1262. The *Holly* Court explained that "the very purpose of reasonable accommodation laws is to require employers to treat disabled individuals differently in some circumstances—namely, when different treatment would allow a disabled individual to perform the essential functions of his position . . . ." *Id*. at 1262–63.

In a subsequent unpublished opinion, *Nadler v. Harvey*, 2007 WL 2404705 (11th Cir. 2007), a panel of the Eleventh Circuit held that *McDonnell Douglas* does not apply to ADA failure to accommodate claims:

> [A]pplying McDonnell Douglas to reasonable accommodation cases would be superfluous, since there is no need to prove discriminatory motivation. A majority of our sister circuits have been persuaded by this distinction, and we join with them today and hold that *McDonnell Douglas* burden shifting is not applicable to reasonable accommodation cases.

*Nadler*, 2007 WL 2404705, at *9.

Accordingly, Ms. Moore may prove her ADA failure to accommodate claim without engaging in a burden shifting analysis. *See Haines v. Cherokee County*, 2010 WL 2821853, *9 (N.D. Ga. 2010) (rejecting *McDonnell Douglas* in failure to accommodate cases); *Alexander v. TFM Boral Brick, Inc.*, WL 4951240, *11 (M.D. Ala. 2008) (finding *Nadler* persuasive and adopting its reasoning despite the case's status as an unpublished decision).

### b. Prima Facie Elements

To establish a prima facie case of ADA disability discrimination, and to survive summary judgment on her failure to accommodate claim, Ms. Moore must show that: (1) she is disabled, (2) she is a "qualified individual" who is able to perform the "essential functions" of the job, "with or without reasonable accommodation"; and (3) she was subjected to an adverse employment action because of her disability. *See Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *see also Holly*, 492 F.3d at 1255–56. CSC does not dispute that Ms. Moore is a qualified individual within the meaning of the ADA. The Court therefore focuses on the first and third elements of Ms. Moore's prima facie case—whether Ms. Moore is disabled within the meaning of the ADA and whether CSC discriminated against Ms. Moore based on her disability.

Ms. Moore asserts that she is disabled under the ADA because of her cancer diagnosis in 2010 and her cancer recurrence in 2013. (Doc. 23, p. 21). CSC argues that Ms. Moore is not disabled because her cancer "did not limit[] any major life activity when it recurred in 2013 through the time she was discharged in March of 2014." (Doc. 20, p. 18). CSC confuses Ms. Moore's burden. As a result of the 2008 Amendments to the ADA, a plaintiff no longer must show that an employer perceived a disability as limiting a major life activity. *Dulaney v. Miami–Dade County*, 481 Fed. Appx. 486, 489 n. 3 (11th Cir. 2012) ("In 2008 . . . Congress changed the definition of 'disability' such that being 'regarded as' having a disability no longer requires a showing that the employer perceived the individual to be substantially limited in a major life activity."). Under the current version of the ADA, Ms. Moore may establish that she is disabled by demonstrating that CSC perceived a physical or mental impairment—"whether or not the impairment . . . is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

On the record in this case, a jury could conclude that Ms. Moore is disabled within the meaning of the ADA. As Ms. Vadenoff acknowledged, CSC perceived that Ms. Moore had cancer in 2010. Ms. Vadenoff testified that "once you have

cancer, you're always known to have cancer." (Doc. 21-2, p. 7).[4]  Ms. Vadenoff

explained that "I knew she [Ms. Moore] had cancer in 2010, then in 2014 I still

knew she had cancer in 2010." (Doc. 21-2, p. 7).  These statements, viewed in the

light most favorable to Ms. Moore, support a reasonable inference that CSC

regarded Ms. Moore as having a physical impairment.

There also is evidence from which jurors reasonably could infer that CSC

discriminated against Ms. Moore based on her disability.  In October of 2013, Ms.

Moore spoke with the CSC leave coordinator, Cathy Kirby, about the fact that her

cancer had returned and that she would need to take FMLA leave.  (Doc. 19-1, pp.

19, 35, 46–48; Doc. 24-6, ¶ 18).  Ms. Moore admits that she did not complete the

FMLA paperwork and that she withdrew her leave request in November 2013.

(Doc. 19-1, p. 50).  But Ms. Moore testified that she delayed leave because Ms.

Vadenoff indicated that employees could not get sick or be absent for any reason

during "the push." (Doc. 19-1, pp. 34-35, 46).  Mr. Romine also had warned Ms.

Moore six months earlier that fiscal year 2014 would "be [a] challenging year for

NPS Defense Billing," (Doc. 24-9, p. 32), and Ms. Moore recognized that her

department had undergone many changes in fiscal year 2013.  (Doc. 24-9, p. 33).

Jurors could reasonably infer that in this context, Ms. Moore felt pressure from Ms.

_____

[4] In the absence of this testimony, the Court would give closer scrutiny to CSC's argument regarding Ms. Moore's assertion that she was "disabled" within the meaning of the ADA.  On the record in this case, Ms. Vadenoff's testimony creates a question of fact regarding CSC's perception of a physical impairment.

Vadenoff's instruction not to take leave during the push. Ms. Moore testified that she "was waiting for after the push" to take leave because she understood that during the push, CSC employees were "forbidden to take leave." (Doc. 19-1, pp. 31, 46). Just after the push had ended, on March 28, 2014, CSC, in Ms. Moore's words, "got rid of [her]" before she could exercise her FMLA leave. (Doc. 19-1, p. 46).

Although Ms. Vadenoff denies making statements that employees could not get sick or take leave during "the push," (Doc. 21-2, pp. 7, 10), the Court must, for purposes of summary judgment, resolve conflicting testimony in Ms. Moore's favor. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("[W]hen conflicts arise between the facts evidenced by the parties, [courts] must credit the nonmoving party's version.").

Relying on *Spears v. Creel*, 607 Fed. Appx. 943 (11th Cir. 2015); *Wood v. Green*, 323 F.3d 1309 (11th Cir. 2003); and *Duckett v. Dunlop Tire Corp.*, 129 F.3d 1222 (11th Cir. 1997), CSC argues that it is entitled to judgment in its favor because Ms. Moore's request for an accommodation in the fall of 2013 was not reasonable. CSC submits that "for a requested leave of absence to be a reasonable accommodation, it must be definite." (Doc. 20, p. 20). That is true, but Ms. Moore's situation is unlike the situations at issue in the cases on which CSC relies because before electing to withdraw her leave request, Ms. Moore had indicated

that she would need up to 12 weeks of leave. (Doc. 24-7, p. 2). CSC had advised Ms. Moore that she was eligible for leave beginning on November 4, 2013, (Doc. 19-5, pp. 90–91), causing her to be absent from work through early February 2014 if she took 12 full weeks of leave. The record, viewed in the light most favorable to Ms. Moore, does not suggest that her initial conversation about a leave of absence was an open-ended request for an accommodation.[5]

Here, although Ms. Moore's request for a leave of absence was definite, Ms. Moore withdrew her leave request. Viewing the evidence in the light most favorable to Ms. Moore, Ms. Moore did so because Ms. Vadenoff, the individual charged with selecting employees for layoff, made clear to Ms. Moore and others in her department that she (Ms. Vadenoff) would not tolerate absences during the push, and Ms. Moore's proposed leave for chemotherapy treatment would extend through the first part of the push.

Ms. Moore's withdrawal of her leave request presents an unusual scenario. It is well-settled that "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Spears*, 607 Fed. Appx. at 948 (quoting *Gaston v. Bellingrath Gardens & Home, Inc.*, 167

---

[5] The plaintiff in *Spears* asserted that in addition to the twelve weeks of FMLA leave which she requested and used, the employer also could have given her an extended leave using paid or unpaid leave or "donated leave" from her fellow employees. *Spears*, 607 Fed. Appx. at 950. Because the plaintiff never requested any of these options, the Court found that the employer's duty to provide an accommodation was not triggered. *Id*. *Wood* and *Duckett* dealt with requests for indefinite leaves of absence and are inapposite here.

F.3d 1361, 1363 (11th Cir. 1999)). The Court has found no opinion that evaluates whether the specific demand requirement is met when an employee withdraws a request for leave because a decision-maker instructs employees that they are "forbidden to take leave" during a particular timeframe. Ms. Moore worked in a group that faced mandatory staff reductions in 2009, 2012, and 2013. Ms. Vadenoff stated in her affidavit that she could have laid Ms. Moore off in 2013, but she (Ms. Vadenoff) selected another employee instead. (Doc. 21-1, ¶ 7). Mr. Romine warned Ms. Moore in May 2013 that FY 2014 was going to be a challenging year for her department. Jurors reasonably could infer that Ms. Moore knew that Ms. Vadenoff was responsible for layoffs, that CSC had been downsizing for years, and that Mr. Romine's comments about a challenging fiscal year 2014 meant that layoffs might be imminent. Assuming the truth of Ms. Moore's testimony that Ms. Vadenoff said that no one was to take leave during the push, reasonable jurors could find that Ms. Moore withdrew her leave request to preserve her job.

In determining whether Ms. Moore may proceed under these circumstances, "the Court must keep in mind the remedial nature of [the ADA]." *Boyd v. Brookstone Corp. of New Hampshire, Inc.*, 857 F. Supp. 1568, 1572 (S.D. Fl. 1994) (quoting *Bilka v. Pepe's Inc.*, 601 F. Supp. 1254, 1259 (N.D. Ill. 1985)); *see also Bartlett v. New York State Board of Law Examiners*, 2 F. Supp. 388, 391

(S.D.N.Y. 1997) (referring to the "remedial nature of the ADA as a whole"). Under the circumstances of this case, given the remedial nature of the ADA, the Court finds that a plaintiff like Ms. Moore may proceed past the summary judgment stage when the evidence demonstrates that the plaintiff reversed her initial effort to obtain as an ADA accommodation a leave of absence because she faced a legitimate, objective threat of a layoff if she proceeded with her request for accommodation.[6]

Finally, CSC argues that Ms. Moore's claim fails because she cannot identify a comparator "who was treated more favorably under nearly identical circumstances." (Doc. 20, pp. 18–19). CSC asserts that "[p]laintiff has not established whether . . . any of the other lead billers had cancer at the time of the RIF, or any time in the past." (Doc. 20, p. 19). The Court finds that no such comparator evidence is required for Ms. Moore to establish her ADA accommodation claim. As the Eleventh Circuit noted in *Holly*:

> [An employer] is not insulated from liability under the ADA by treating its non-disabled employees exactly the same as its disabled employees. In race and sex discrimination cases, discrimination is usually proved by showing that employers treat similarly situated employees differently because of their race or sex. However, the very purpose of reasonable accommodation laws is to require employers to treat disabled individuals differently in some circumstances. . . . Allowing uniformly-applied disability neutral policies to trump the

---

[6] By analogy, as discussed below, a plaintiff may pursue an FMLA interference claim not only by proving that her employer refused a request for FMLA leave but also by proving that the employer discouraged requests for leave. *See* p. 30 below.

ADA requirement of reasonable accommodations would utterly eviscerate the ADA requirement.

*Holly*, 492 F.3d at 1247 (citing *US Airways, Inc. v. Barnett*, 535 U.S. 391, 397–98 (2002)).[7]

Viewing the evidence in the light most favorable to Ms. Moore, her ADA failure to accommodate claim survives summary judgment.

### 2. Ms. Moore's ADA Termination Claim

Ms. Moore pursues her ADA termination claim on the basis of circumstantial evidence. To analyze claims of intentional discrimination based on circumstantial evidence, the Court applies the burden shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Anderson v. Embarq/Sprint*, 379 Fed. Appx. 924, 927 (11th Cir. 2010). The first step under *McDonnell Douglas* requires a plaintiff to establish a prima facie case of discrimination. *See Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *see also Holly*, 492 F.3d at 1255–56. This initial proof establishes a rebuttable presumption that the employer acted illegally. *See McDonnell Douglas*, 411 U.S. at 802. "[T]he burden [then] shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the adverse employment action."

---

[7] CSC also argues that Ms. Moore's claim fails because she testified that in October 2013, she was not emotionally ready to take leave. Ms. Moore's testimony about emotional readiness, placed in context, indicates that the push and her concerns about taking leave impacted her emotional readiness to seek treatment during a period of time that would extend into the three-month window in which the decision-maker forbade leave. (Doc. 19-1, pp. 34-35, 48-49).

*Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer meets this burden, then the burden shifts back to the plaintiff to "show that the [employer's] proffered reasons were pretextual." *Gray v. City of Jacksonville, Fla.*, 492 Fed. Appx. 1, 4 (11th Cir. 2012).

The prima facie case for Ms. Moore's ADA termination claim is the same as that required to establish a claim for ADA failure to accommodate. *See Haines*, WL 2821853, at *10 ("Under either a failure to accommodate theory or a disparate treatment theory, a plaintiff establishes a prima facie case of discrimination under the ADA by showing that (1) he has a disability; (2) he is a qualified individual; and (3) the defendant unlawfully discriminated against him because of the disability.") (internal quotations omitted); *see also Rylee v. Chapman*, 316 Fed. Appx. 901, 905–06 (11th Cir. 2009) (stating same prima facie elements as applicable to ADA claims for "intentional discrimination, disparate treatment, or failure to make reasonable accommodations"). Because Ms. Moore already has established her prima facie case, the burden shifts to CSC to articulate a legitimate, nondiscriminatory reason for selecting Ms. Moore for termination.

CSC does not have to "persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof." *Gray*, 492 Fed. Appx. at 7 (internal quotation omitted). CSC submits that Ms. Moore

was selected for layoff based on her 2014 performance evaluation and based on complaints from billers about her interpersonal skills. CSC also submits that Ms. Moore was laid off pursuant to a bona fide reduction in force, and that a RIF for economic reasons is a legitimate, nondiscriminatory purpose. Ms. Moore's alleged poor performance and interpersonal issues and the CSC RIF are legitimate, nondiscriminatory reasons for taking the challenged employment action. Thus, CSC has met its "exceedingly light burden." *See Holified v. Reno*, 115 F.3d 1555 (11th Cir. 1997).

Turning to the question of pretext, Ms. Moore asserts that CSC's proffered reasons are false and that CSC laid her off because of her disability and her need for FMLA leave. Ms. Moore's brief focuses almost entirely on the ADA failure to accommodate claim, but the record contains sufficient evidence to create a question of fact about the real reason that CSC selected Ms. Moore for layoff.

First, CSC has failed to produce evidence that would substantiate the criticisms in Ms. Moore's 2014 performance review. The 2014 review, suddenly labeling Ms. Moore as a mediocre performer difficult to work with, does not square with Ms. Moore's CSC reviews between 2006 and 2013. Just one year earlier, in her 2013 review, CSC deemed Ms. Moore "the #1 Billing Lead in the Huntsville office." (Doc. 24-9, p. 36). Second, CSC does not account for the anomalies in Ms. Moore's 2014 review. If Mr. Romine authored the review, it is

unclear why he did not sign or acknowledge it, as he had in all previous years. (*Compare* Doc. 21-1, p. 13 *with* Doc. 19-5, p. 31; Doc. 24-9, p. 11; Doc. 24-9, p. 14; Doc. 19-5, p. 51; Doc. 24-9, p. 18; Doc. 24-9, p. 23; Doc. 24-9, p. 28). Third, Ms. Vadenoff's statements concerning Ms. Moore's cancer—"I believe that once you have cancer you're always known to have cancer"—combined with her statements about not getting sick or taking leave during the push—are circumstantial evidence of discriminatory intent. So too is her statement that she could have laid off Ms. Moore in 2013, but she didn't. A jury could infer that Ms. Moore's excellent 2013 appraisal would preclude a layoff.

Finally, Ms. Vadenoff indicated that she selected Ms. Moore for termination because Ms. Moore was the only billing lead who partially met expectations. (Doc. 21-1, ¶ 10). The record contradicts this assertion. Ms. Bates, who Ms. Vadenoff retained, also had ratings in her 2014 performance review of "partially met expectations" in two categories along with criticisms concerning Ms. Bates's ability to manage people. (Doc. 24-10, p. 10). Ms. Vadenoff also testified that she did not consider the education levels (or seniority) of Ms. Moore or Ms. Bates because CSC's RIF policy did not require it. (Doc. 21-1, ¶ 10). But CSC's job description for the billing lead position states: "[b]achelor's degree in business administration, accounting, finance, or related field preferred." (Doc. 24-8, p. 4). At the time of the RIF, Ms. Moore had a bachelor's degree and a master's degree

in business administration. (Doc. 19-1, p. 23). Ms. Bates, at the time of her fiscal year 2013 performance review, had not yet obtained a bachelor's degree. (See Doc. 24-10. p. 11) (noting that "she [Dawn] remains committed to pursuing her BS in Accounting/Finance"). Although the Court may not second-guess the business judgment of employers, *see Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000), the Court may inquire further into "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered explanations. *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)).

Based on the facts and circumstances in this case, a jury could conclude that CSC's stated reasons for Ms. Moore's termination are false and that the real reason for the termination was disability discrimination. Genuine issues of material fact preclude summary judgment on Ms. Moore's ADA termination claim.

B.    *Ms. Moore's Title VII, Section 1981, and ADEA Claims*

Ms. Moore alleges that CSC terminated her based on her race in violation of Title VII and 42 U.S.C. 1981. She also asserts that CSC terminated her because of her age in violation of the ADEA. Title VII and Section 1981 "have the same requirements of proof and use the same analytical framework[.]" *Standard v.*

*A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Under Title VII or Section 1981, Ms. Moore may establish her claim based on direct, circumstantial, or statistical evidence. *Standard*, 161 F.3d at 1330. The same is true for Ms. Moore's ADEA claim. Ms. Moore has not produced direct evidence or statistical evidence of race or age discrimination. Ms. Moore relies instead on circumstantial evidence, asserting that CSC retained a white individual under the age of 40, while selecting Ms. Moore for termination.

Ms. Moore argues at length that the *McDonnell Douglas* framework does not apply to the analysis of her Title VII claim because this case is more properly characterized as a "mixed motive" case. Ms. Moore asserts that under *Quigg v. Thomas County School District*, 814 F.3d 1227 (11th Cir. 2016), she need only show that race was a "motivating factor" for the decision to terminate her, "even though other factors also motivated the action." (Doc. 23, p. 11). Without characterizing this as a mixed motive case, the Court finds that even applying this lower evidentiary standard, Ms. Moore's Title VII and ADEA claims fail. In contrast to her ADA claims, no evidence exists to support her claims of race and age discrimination.

Ms. Bates, a lead biller who CSC retained in 2014, is under the age of 40 and Caucasian. But CSC retained other lead billers in its reduction in force who are African American and over the age of forty. One lead biller who CSC retained

was 58 years old at the time of the 2014 reduction in force. (*See* Doc. 21-1, ¶ 10). Also, CSC selected Caucasians for layoff in 2014 and prior fiscal years.

Ms. Moore has not put forth evidence that CSC terminated her or otherwise discriminated against her because of her race or her age. Because Ms. Moore has not produced evidence that could convince a jury that race or age motivated CSC's decision, Ms. Moore's Title VII, Section 1981, and ADEA claims fail as a matter of law.

## C.    *Ms. Moore's FMLA Interference Claim*

The FMLA permits an employee to take up to twelve weeks annually of unpaid leave to seek treatment for a serious health condition. *See* 29 U.S.C. 2612(a)(1)(D). The Eleventh Circuit has recognized a private right of action for an employer's interference with the exercise of FMLA rights. *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1247 (11th Cir. 2015); s*ee* 29 U.S.C. 2615 (a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA). FMLA interference includes 'not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.' *Seguin v. Marion County Health Dept.*, 2014 WL 3955162, *9 (M.D. Fla. 2014) (quoting 29 C.F.R. § 825.220).

To prove FMLA interference, an employee must demonstrate that she was denied a benefit to which she was entitled under the FMLA and that she "has been

prejudiced by the violation in some way." *Evans v. Books-A-Million*, 762 F.3d 1288, 1295 (11th Cir. 2014) (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)); *see also Seguin*, 2014 WL 3955162 at *10 ("This Circuit and other courts have followed *Ragsdale* and have held that an interference claim cannot lie where there is no actual prejudice to the employee."). A plaintiff can demonstrate prejudice by offering evidence of legal damages—such as compensation, benefits, and other monetary losses sustained because of the violation—or by demonstrating some harm that equitable relief may remedy. *Evans*, 762 F.3d at 1296 (noting that "prejudice" is not synonymous with "legal damages").

In the present case, Ms. Moore has produced sufficient evidence for a jury to conclude that CSC interfered with her FMLA rights by discouraging her from taking leave during the fall of 2013. The most convincing example of such discouragement is Ms. Moore's testimony that Ms. Vadenoff stated that employees could not get sick or take leave during the push. *Diamond v. Hospice of Florida Keys, Inc.*, 677 Fed. Appx. 586, 592 (11th Cir. 2017) (employer email to plaintiff that her absence from work compromised patient care constituted "convincing evidence" of FMLA interference); *see also Santiago v. Department of Transportation*, 50 F. Supp. 3d 136, 144 (D. Conn. 2014) (quoting *Reilly v. Revlon*, 620 F. Supp. 2d 524, 535 (S.D.N.Y. 2009) (noting that in the Second Circuit, one

way that a plaintiff may prevail on an FMLA interference by discouragement theory is to demonstrate that 'the employer's purported acts of discouragement would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights')).

The Court finds that Ms. Vadenoff's alleged statements, if proven, could lead a reasonable CSC employee to conclude that leave should not be requested during the push. This is particularly true considering CSC's reduction in force during the 2013 calendar year. CSC contends that Ms. Moore delayed her request for leave for personal reasons because she was not ready emotionally to begin cancer treatment; however, Ms. Moore's testimony indicates that her emotional readiness for treatment was closely connected to her concerns about taking leave during the push. Ms. Moore explained:

Q: What was the reason that you decided to delay it?

A: At that time, in October, I really wasn't ready.

Q: Like emotionally?

A: Right.

Q: How long were you going to delay it?

A: I was going to wait until after the push.

(Doc. 19-1, p. 48-49). It is not clear that Ms. Moore would have delayed at all were it not for the push. Drawing inferences from the evidence in favor of Ms.

Moore, the Court finds that reasonable jurors could conclude that individuals diagnosed with a recurrence of cancer typically do not delay treatment for six months (here, October 2013 through March 2014) unless they have a very good reason for the delay.

Finally, CSC contends that Ms. Moore's claim must fail because even if Ms. Vadenoff discouraged Ms. Moore from taking leave, Ms. Vadenoff had no knowledge that Ms. Moore's cancer returned or that Ms. Moore had requested leave in 2013. Ms. Vadenoff's testimony undermines this argument. Ms. Vadenoff stated: "I believe once you have cancer, you're always known to have cancer." (Doc. 21-2, p. 7). In addition, there is no evidence in the record to account for the about-face in Ms. Moore's 2014 performance review. In 2007, 2008, 2009, 2010, 2011, 2012, and 2013, Ms. Moore was rated as meeting, exceeding, or far exceeding expectations in all performance categories. After October 2013 when Ms. Moore initiated the process to request FMLA leave because of the recurrence of her cancer, Ms. Moore received her first "partially meeting expectations" rating. Based on these circumstances, and viewing the facts in a light most favorable to Ms. Moore, a jury could conclude that CSC discouraged Ms. Moore from asserting her FMLA rights in 2013.

The Court also finds that genuine issues of material fact exist as to whether Ms. Moore suffered prejudice as a result of CSC's possible interference with her

FMLA rights. A plaintiff can demonstrate prejudice by proving that her employer terminated her employment. *See Alexander v. Carolina Fire Control Inc.*, 112 F. Supp. 3d. 340, 350 (M.D.N.C. 2015) (plaintiff showed prejudiced where interference resulted in performance issues that led to plaintiff's termination); *Felder v. Edward*, 2016 WL 7668477, at \*3 (S.D. Miss. 2016) (plaintiff prejudiced when she was terminated for excessive absences following FMLA leave request which employer denied).

## IV. CONCLUSION

For the reasons discussed above, the Court **GRANTS** in part and **DENIES** in part CSC's motion for summary judgment. The Court grants CSC's motion with respect to Ms. Moore's claims under Title VII, Section 1981, the ADEA and the Rehabilitation Act. The Court denies CSC's motion with respect to Ms. Moore's ADA claims and her FMLA interference claim.

**DONE** and **ORDERED** this September 5, 2017.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE